PITSCH v ESE MICHIGAN, INC

Docket Nos. 203021, 203022, 203023. Submitted October 6, 1998, at Grand
    Rapids. Decided February 2, 1999, at 9:00 A.M. Leave to appeal
    denied, 459 Mich ___.

    Gary Pitsch brought an action in the Wexford Circuit Court against
    ESE Michigan, Inc., J & S Group, Inc., Dunbar Excavating Com-
    pany, Inc., and others, seeking from Dunbar and J & S Group the
    recovery of the cost of remedying environmental contamination on
    property the plaintiff purchased from J & S Group. The plaintiff
    also asserted a negligence claim against Dunbar and negligence and
    misrepresentation claims against ESE. Numerous other parties
    were added as third-party and fourth-party plaintiffs and defend-
    ants. The court, Charles D. Corwin, J., granted Dunbar's motion for
    summary disposition with regard to the negligence claim on the
    basis that the claim was barred by the statute of limitations. The
    court also granted summary disposition in favor of Dunbar and J &
    S Group with regard to the plaintiff's claims under the Michigan
    Environmental Response Act (MERA), MCL 299.601 et seq.; MSA
    13.32(1) et seq., on the ground that the MERA does not create a pri-
    vate cause of action for the recovery of response activity costs. The
    court also granted ESE's motion for summary disposition under
    MCR 2.116(C)(10), finding no genuine issue of material fact
    whether ESE breached its duty of care when it conducted environ-
    mental assessments of the property and reported its findings, not-
    ing that ESE disclosed the existence of contamination resulting
    from an underground storage tank and had recommended to the
    plaintiff that he not purchase the property. The plaintiff appealed
    from the summary disposition order in favor of J & S Group and
    Dunbar with regard to the claims under the MERA (Docket Nos.
    203021, 203022), appealed from the summary disposition order in
    favor of Dunbar and ESE with regard to the negligence and misrep-
    resentation claims (Docket Nos. 203021, 203023), and also appealed
    from the order granting summary disposition in favor of Dunbar
    that was based on the bar of the statute of limitations (Docket No.
    203023). The appeals were consolidated.

    The Court of Appeals held:

    1. The court erred in granting summary disposition for J & S
    Group and Dunbar with regard to the MERA claims. That part of the

order in Docket No. 203021 and the order in Docket No. 203022 must be reversed. Subsection 12(2)(b) of the MERA, MCL 299.612(2)(b); MSA 13.32(12)(2)(b), expressly creates a private cause of action for the recovery of response activity costs. State activity is not a prerequisite to an action to recover response activity costs, nor is determination of liability by the Department of Natural Resources a prerequisite to the recovery of response activity costs.

2. The MERA does not provide that a potentially responsible person may only recover response costs from other potentially responsible persons in an action for contribution under MCL 299.612c; MSA 13.32(12c) after the potentially responsible person enters into a settlement agreement with the state or the state initiates an action against the potentially responsible person under MCL 299.612; MSA 13.32(12).

3. MCL 299.612(7); MSA 13.32(12)(7) does not govern actions initiated by a private party or prohibit a private cause of action under subsection 12(2)(b).

4. The court properly granted summary disposition in favor of Dunbar and ESE with regard to the negligence and misrepresentation claims. That part of the orders in Docket Nos. 203021 and 203023 must be affirmed.

5. The removal of the underground storage tank by Dunbar was not the making of an "improvement" for purposes of the statute of repose, MCL 600.5839(1); MSA 27A.5839(1). The court properly granted Dunbar's motion for summary disposition with regard to the negligence claim after finding that the three-year period of limitation in MCL 600.5805(8); MSA 27A.5805(8), not the six-year period of limitation in the statute of repose, applied to the claim. That part of the order in Docket No. 203023 must be affirmed.

Affirmed in part and reversed in part in Docket No. 203021. Reversed in Docket No. 203022. Affirmed in Docket No. 203023.

1. ENVIRONMENT — ENVIRONMENTAL RESPONSE ACT — ACTIONS — RESPONSE ACTIVITY COSTS — PRIVATE CAUSES OF ACTION.

Subsection 12(2)(b) of the Environmental Response Act expressly creates a private cause of action for the recovery of response activity costs from potentially responsible persons described in subsection 12(1) of the act (MCL 299.612[1],[2][b]; MSA 13.32[12][1],[2][b]).

2. ENVIRONMENT — ENVIRONMENTAL RESPONSE ACT — ACTIONS — PREREQUISITES.

The Environmental Response Act does not require state action in all cleanup projects under the act; neither state activity nor a determi-

nation of liability by the Department of Natural Resources is a prerequisite to the recovery of response activity costs in a private cause of action under the act (MCL 299.601 *et seq.*; MSA 299.601 *et seq.*).

3. ENVIRONMENT — ENVIRONMENTAL RESPONSE ACT — ACTIONS — PREREQUISITES.

The Environmental Response Act does not provide that a potentially responsible person may only recover response activity costs from other potentially responsible persons in an action for contribution under § 12c of the act after the potentially responsible person enters into a settlement agreement with the state or the state initiates an action against the potentially responsible person under § 12 of the act; the act does not require state activity as a prerequisite to a private cause of action under the act seeking recovery of response activity costs (MCL 299.612, 299.612c; MSA 13.32[12], 13.32[12c]).

4. LIMITATION OF ACTIONS — STATUTE OF REPOSE — WORDS AND PHRASES — IMPROVEMENT.

The term "improvement" in the statute of repose that applies to a claim of damages against a contractor for injury or damage arising out of the defective and unsafe condition of an improvement to real property refers to a product, object, or some other tangible item that remains on the real property after a contractor completes the work; the term does not encompass the removal of an underground storage tank from the property (MCL 600.5839[1]; MSA 27A.5839[1]).

*McShane & Bowie, P.L.C.* (by *Terry J. Mroz*), for Gary Pitsch.

*Howard & Howard Attorneys* (by *James H. Geary*), for ESE Michigan, Inc.

*Dingeman, Dancer & Christopherson, P.L.C.* (by *James A. Christopherson*), for J & S Group, Inc.

*Haskell Shelton,* for Dunbar Excavating Company, Inc.

Before: CORRIGAN, C.J., and DOCTOROFF and FITZGERALD, JJ.

CORRIGAN, C.J. In these consolidated appeals, plaintiff Gary Pitsch appeals by right orders granting summary disposition for defendants ESE Michigan, Inc., J & S Group, Inc.,[1] and Dunbar Excavating Company, Inc., on his claims for the recovery of the cost of remedying environmental contamination on his property. This case squarely presents the issue whether a private cause of action for the recovery of response activity costs exists under the Michigan Environmental Response Act (MERA), MCL 299.601 et seq.; MSA 13.32(1) et seq.[2] We hold that a private cause of action exists and accordingly reverse the grant of summary disposition for defendants J & S Group and Dunbar regarding plaintiff's MERA claims. We affirm, however, the grant of summary disposition for defendants ESE and Dunbar on plaintiff's claims of negligence and misrepresentation.

### I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

This case arises from plaintiff's purchase of real property in Cadillac from defendant J & S Group for $80,000. The agreement was contingent on the com-

---

[1] All references to defendant J & S Group, Inc., include individual defendant John Springberg.

[2] This action arises under the MERA as amended in 1990 and 1993. 1990 PA 233; 1990 PA 234; 1993 PA 310. Effective March 30, 1995, the Legislature repealed the MERA and recodified its provisions as Part 201 of the Natural Resources and Environmental Protection Act (NREPA), MCL 324.20101 et seq.; MSA 13A.20101 et seq., 1994 PA 451, MCL 324.90101; MSA 13A.90101. Under MCL 324.102; MSA 13A.102, however, the repeal of the MERA does not relinquish any civil liability and the MERA remains in force for the purpose of sustaining an action for the enforcement of that liability. Further, although the Legislature substantially amended Part 201 of the NREPA effective June 5, 1995, 1995 PA 71, and again effective June 29, 1995, 1995 PA 117, the amendments do not apply to judicial actions initiated on or before May 1, 1995. Those actions are governed by the provisions of the act in effect on May 1, 1995. MCL 324.20102a(1)(a); MSA 13A.20102a(1)(a).

pletion of an "acceptable" environmental assessment. A week after signing the purchase agreement in May 1991, plaintiff retained defendant ESE to perform a Phase I environmental assessment of the property to identify potential environmental hazards. ESE identified four potential hazards in a report dated June 6, 1991: (1) the possibility of a large-capacity underground storage tank that once held fuel oil; (2) the existence of insulation that possibly contained asbestos; (3) the presence of oil stains near the building; and (4) the existence of a two-inch pipe possibly associated with an underground storage tank. ESE recommended that plaintiff retain it to perform a Phase II investigation during which it would analyze soil and groundwater samples to determine the presence of environmental contamination.

After receiving the Phase I report, plaintiff attempted to initiate a Phase II investigation, but J & S Group would not allow him access to the property. Plaintiff subsequently requested that the parties close on the agreement to sell the property. J & S Group declined to close, claiming that plaintiff breached the contract by not closing on the agreement within thirty days of receiving the Phase I investigation report. In response, plaintiff commenced an action in August 1991 to force the sale.

In late summer 1991, the city of Cadillac initiated condemnation proceedings against the property in an effort to facilitate its development and retained defendant ESE to complete a Phase II investigation. As part of the investigation, ESE dug a trench at the location of the suspected underground storage tank. ESE did not find a storage tank, but discovered stained soil that smelled of fuel oil, indicating that a

tank had been removed. ESE then installed monitoring wells to capture groundwater for testing. The initial tests revealed no contamination. ESE notified the city of its preliminary findings in an October 14, 1991, report:

> A soil sample collected from the former UST location contained detectable levels of semivolatile polynuclear aromatics (PNAS) including fluoranthene (360 ug/kg) and pyrene (480 ug/kg), and the volatile organic compound xylene (19 ug/kg). No semivolatile compounds including PNAS and volatile compounds including benzene, toluene, ethylbenzene and xylenes (BTEX) were detected in the groundwater. Detection limits for PNAS is 5 ug/l and 1 ug/l for BTEX compounds in water. Semivolatile PNAS and volatile BTEX compounds are commonly found in petroleum products including fuel oil.
>
> The concentrations of the PNA and BTEX compounds which were found in site soils exceed their respective Type A cleanup criteria for these compounds, set forth in the guidance documents developed by the Michigan Department of Natural Resources (MDNR), in accordance with the Environmental Contamination Response Activity Administrative Rules for 1982, P.A. 307, as amended. Type A standards are based on recommended analytical detection limits for laboratory instruments, which for the PNA compounds is 330 ug/kg and 10 ug/kg for xylenes in soils. However, the detectable quantities of PNA and BTEX compounds do not exceed the MDNR Type B cleanup criteria which are based on concentrations which when inhaled, ingested or through skin exposure may impact human health. The MDNR may enforce either cleanup criteria depending upon the degree of risk the contamination may pose to human health or the environment.

ESE concluded as follows:

Based on the limited sampling performed by ESE, and the subsequent detection of PNAS in the Kraft

property soils, it is our opinion that the City of Cadillac may be at substantial risk of accepting liability for site cleanup, if it condemns the subject property for public use.

ESE recommended that the city not condemn the property without additional testing to determine the extent of the contamination and the cost of remedying it.

The city subsequently contracted with ESE for further groundwater testing. In early 1992, ESE installed two additional monitoring wells on the property. Testing of samples collected from the wells revealed no contaminants associated with fuel oil. ESE then notified the city in an April 16, 1992, letter that, although the soil at the site of the former storage tank was contaminated, the groundwater was not. ESE reported the following findings and recommendations:

> Based on the available data set, it is our position that soils have been impacted by a release at the former UST location. However, based on the available data the release has not impacted the quality of the groundwater at the former UST site at MW-1, or downgradient from the release location at MW-5. Furthermore, BTEX and PNA levels detected in the soil sample collected from the release location do not exceed Michigan Department of Natural Resources (MDNR) Type B cleanup standards. Type B concentration levels for soils are based on human health risk standards and adverse aesthetic impact on the underlying groundwater.
>
> Although the Type B cleanup standards have not been exceeded in this case, ESE recommends that the discolored soils be removed and disposed of at Wexford County Landfill by the current property owners. This would further limit the Cadillac Downtown Development Authorities [sic] liability in the event that cleanup regulations become more strin-

gent or change in the future. However, the landfill will require that the MDNR be notified of the owner's intent to dispose of soils which, in turn, will bring the site under close scrutiny by the MDNR.

On June 17, 1992, the trial court ordered that J & S Group comply with the terms of the sales agreement. Plaintiff and J & S Group thereafter entered into a settlement agreement under which J & S Group agreed to convey the property and plaintiff agreed to hold it harmless and indemnify it against any claims arising from the contamination to the extent that the hazard was disclosed in the ESE reports and other documents. J & S Group conveyed the property to plaintiff on July 31, 1992. Plaintiff subsequently demolished the building located on the property and began response activity to remedy the contamination. In March 1993, he allegedly learned that defendant Dunbar had removed one or more underground storage tanks from the property between 1987 and 1991, releasing hazardous substances into the soil.

Plaintiff commenced this action in September 1994, asserting claims against J & S Group and Dunbar for the recovery of response activity costs under the MERA. Plaintiff also asserted a negligence claim against Dunbar and negligence and misrepresentation claims against ESE. In May 1995, the trial court granted Dunbar's motion for summary disposition of plaintiff's negligence claim under MCR 2.116(7) on the ground that the claim was barred by the statute of limitations. In February 1996, the trial court granted summary disposition for Dunbar and J & S Group on plaintiff's MERA claims under MCR 2.116(C)(4) and (10) on the ground that the MERA did not create a private cause of action for the recovery of response

activity costs. The trial court also granted summary disposition for ESE under MCR 2.116(C)(10) on the ground that no genuine issue of fact existed whether ESE breached its duty of care because it disclosed the existence of contamination resulting from an underground storage tank and had recommended against the purchase. The trial court dismissed plaintiff's remaining claim against defendant Patrick Johnson in April 1997.

II. MERA CLAIMS

In Docket Numbers 203021 and 203022, plaintiff argues that the trial court erred in granting summary disposition for defendants J & S Group and Dunbar on his MERA claims on the ground that no private cause of action exists under subsection 12(2)(b) of the act. We agree. Whether a plaintiff has a cause of action under the statute presents a question of statutory interpretation, which we review de novo. *Long v Chelsea Community Hosp*, 219 Mich App 578, 581-582; 557 NW2d 157 (1996). Our purpose in construing a statute is to ascertain the reasonable meaning of the specific language employed by the Legislature. *Faircloth v Family Independence Agency*, 232 Mich App 391, 406; ___ NW2d ___ (1998).

In *Long, supra* at 583, this Court summarized the approach used to determine whether a private cause of action exists:

> If the common law provides no right to relief, and the right to such relief is instead provided by statute, then plaintiffs have *no* private cause of action for enforcement of the right *unless*: (1) the statute expressly creates a private cause of action or (2) a cause of action can be inferred from the fact that the statute provides no adequate means of enforcement of its provisions. *Bell v League Life Ins Co*,

149 Mich App 481, 482-483; 387 NW2d 154 (1986). It follows that courts must dismiss a private cause of action under a statute creating a new right unless the statute expressly created the private cause of action or the cause of action may be inferred because the statute does not provide adequate means to enforce its provisions. *Forster v Delton School Dist*, 176 Mich App 582, 585; 440 NW2d 421 (1989).

A

The MERA established five categories of potentially responsible persons (PRPS), i.e., those who may be liable for the cost of remedial action. *Farm Bureau Mut Ins Co of Michigan v Porter & Heckman, Inc*, 220 Mich App 627, 639; 560 NW2d 367 (1996). Subsection 12(1) of the act provided:

Notwithstanding any other provision or rule of law and subject only to the defenses set forth in sections 12a and 12b, if there is a release or threatened release from a facility that causes the incurrence of response activity costs, the following persons shall be liable under this section:

(a) The owner or operator of the facility.

(b) The owner or operator of the facility at the time of disposal of a hazardous substance.

(c) The owner or operator of the facility since the time of disposal of a hazardous substance not included in subdivision (a) or (b).

(d) A person that by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of a hazardous substance owned or possessed by the person, by any other person, at the facility owned or operated by another person and containing the hazardous substance.

(e) A person that accepts or accepted any hazardous substance for transport to the facility selected by that person. [MCL 299.612(1); MSA 13.32(12)(1).]

Subsection 12(2) of the act established the extent of the PRPS' liability:

> A person described in subsection (1) shall be liable for all of the following:
>
> (a) All costs of response activity lawfully incurred by the state relating to the selection and implementation of response activity under this act.
>
> (b) Any other necessary costs of response activity incurred by any other person consistent with rules relating to the selection and implementation of response activity promulgated under the act.
>
> (c) Damages for the full value of injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing the injury, destruction, or loss resulting from the release. [MCL 299.612(2); MSA 13.32(12)(2).]

B

Although this Court has reviewed several private cost recovery actions, it has not squarely decided whether subsection 12(2)(b) creates a private cause of action. See, e.g., *Port Huron v Amoco Oil Co, Inc*, 229 Mich App 616; 583 NW2d 215 (1998), and *Forest City Enterprises, Inc v Leemon Oil Co*, 228 Mich App 57; 577 NW2d 150 (1998). In *Amoco Oil, supra* at 620, however, this Court commented on the issue in passing:

> Before the 1990 amendments of the "polluters pay" law, the MERA authorized cost recovery actions only by the state. As amended in 1990, the MERA authorized persons other than the state (i.e., private parties) that voluntarily clean up contamination to recover their cleanup costs from PRPs provided that they comply with the provisions of § 12(2)(b).

Our Supreme Court likewise noted the existence of the private cause of action in declining to allow

recovery under a nuisance theory for property depreciation caused by the unfounded perception of environmental contamination of groundwater. *Adkins v Thomas Solvent Co*, 440 Mich 293; 487 NW2d 715 (1992). In *Adkins, supra* at 317, n 36, the Court stated:

> Both state and federal statutes exist which provide for potential remedies including a private cause of action for various forms of pollution. See, e.g., The Comprehensive Environmental Response, Compensation & Liability Act (CERCLA), 42 USC 9601 *et seq.*; the Solid Waste Disposal Act, 42 USC 6901 *et seq.*; the Environmental Response Act, MCL 299.601 *et seq.*; MSA 13.32(1) *et seq.*; the Environmental Protection Act, MCL 691.1201 *et seq.*; MSA 14.528(201) *et seq.*; the Hazardous Waste Management Act, MCL 299.501 *et seq.*; MSA 13.30(1) *et seq.*, the Solid Waste Management Act, MCL 299.401 *et seq.*; MSA 13.29(1) *et seq.*

C

We conclude that subsection 12(2)(b) expressly creates a private cause of action for the recovery of response activity costs from PRPs. The statute explicitly provides that persons identified in subsection 12(1) "shall be liable for . . . necessary costs of response activity incurred by any other person . . . ." MCL 299.612(2)(b); MSA 13.32(12)(2)(b). The Legislature's failure to use the term "cause of action" does not compel this Court to ignore the reasonable construction of these words.[3] Further, other subsections of § 12 refer to "[t]he costs of response activity recov-

---

[3] Similarly, the Legislature's decision to amend Part 201 of the NREPA in 1995 to state the existence of a private cause of action in clearer terms, MCL 324.20126a(7); MSA 13A.20126a(7), does not necessitate a different result under the MERA.

erable under subsection (2)," MCL 299.612(3); MSA 13.32(12)(3), and "[t]he amounts recoverable in an action under this section . . . ." MCL 299.612(4); MSA 13.32(12)(4). Moreover, subsection 17(1)(a) establishes the limitation period for actions "[f]or the recovery of response activity costs and natural resources damages pursuant to section 12(2)(a), (b), or (c) . . . ." MCL 299.617(1)(a); MSA 13.32(17)(1)(a). Similarly, subsection 16(4)(a) grants the circuit court jurisdiction over "[a]n action to recover response costs, damages, or for contribution." MCL 299.616(4)(a); MSA 13.32(16)(4)(a). Giving the statutory language its common meaning, we conclude that subsection 12(2)(b) creates a private cause of action to recover response activity costs.

We reject defendants' argument that state activity is a prerequisite to an action to recover response activity costs. This Court did not hold in *Flanders Industries, Inc v Michigan*, 203 Mich App 15; 512 NW2d 328 (1993), that the MDNR[4] bears the initial responsibility for determining liability under the MERA. Rather, this Court held that, where the MDNR initiates response activity, the circuit court does not have jurisdiction to provide preenforcement review.[5]   In

---

[4] Effective October 1, 1995, the powers of the Environmental Response Division of the Michigan Department of Natural Resources were transferred to the newly created Department of Environmental Quality. MCL 324.99903; MSA 13A.99903.

[5] Subsection 16(4) of the MERA, MCL 299.616(4); MSA 13.32(16)(4), provides:

A state court shall not have jurisdiction to review challenges to a response activity selected or approved by the department under this act, or to review an administrative order issued under this act in any action except an action that is 1 of the following:

(a) An action to recover response costs, damages, or for contribution.

*Flanders*, at 19-23, the MDNR had notified the plaintiff that it was a PRP subject to liability under the MERA for the costs of remedying contamination on its property. The plaintiff then sought a declaratory judgment of nonliability. Following the federal courts' decisions regarding the same issue under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 USC 9601 *et seq.*, this Court held that the circuit court lacked jurisdiction to grant the declaratory relief because it would constitute preenforcement review of an MDNR response action. This Court reasoned that the plaintiff could present its defenses in response to an MDNR cost recovery action.

The MERA does not require state action in all cleanup projects under the act. Section 10e of the MERA grants the MDNR the discretion whether to take response activity and approve proposed response activity. MCL 299.610e; MSA 13.32(10e). Under MDNR rules, a PRP is not required to complete a formal remedial investigation and plan before voluntarily undertaking the cleanup of a contaminated site unless the MDNR requests the action. 1990 AACS, R 299.5501-299.5519; *Amoco Oil, supra* at 630-631. Further, in the event the MDNR initiates response activity, a PRP

(b) An action by the state to enforce an administrative order under this act or by any other person under section 15(1)(b) to enforce an administrative order or to recover a fine for violation of an order.

(c) An action pursuant to section 10f(5) for review of a decision by the department denying or limiting reimbursement.

(d) An action pursuant to section 15 challenging a response activity selected or approved by the department, if such action is filed after the completion of the response activity.

(e) An action by the state pursuant to section 12(6) to compel response activity.

may, but need not, invoke the allocation process established under § 11g. MCL 299.611g; MSA 13.32 (11g). Accordingly, an MDNR determination of liability is not a prerequisite to the recovery of response activity costs.

We also reject defendants' argument that a PRP may only recover response costs from other PRPs in an action for contribution under § 12c, MCL 299.612c; MSA 13.32(12c), after it enters into a settlement agreement with the state or the state initiates an action against it under § 12. A construction of § 12 that limits a private party's remedy to contribution would leave some of those who voluntarily undertake response activity costs without a remedy. For instance, the present owner of contaminated property is liable for response activity costs under subsection 12(1)(a). In cases where the owner did not cause the release, his action is not one for contribution, but rather is designed to shift the entire cost of response activity to the party or parties that caused the release. Under defendants' proposed construction of the act, however, the owner could not initiate such an action. Consequently, contrary to the purpose of the MERA, an owner would be discouraged from voluntarily remedying contamination on his property.

Further, subsection 12(7) of the MERA does not require a determination that subsection 12(2)(b) does not create a private cause of action. Subsection 12(7), MCL 299.612(7); MSA 13.32(12)(7), provides:

> In establishing liability under this section, the department shall bear the burden of proof. If the department proves a prima facie case against a person, the person shall bear the burden of showing by a preponderance of the evidence that they are not liable under this section.

Subsection 12(7) does not reflect a legislative intent to prohibit a private cause of action, contrary to the plain language of subsection 12(2)(b). Subsection 12(7) merely allocates the burden of production and persuasion in actions initiated by the MDNR. It does not govern actions initiated by a private party. Giving the language of the statute its plain meaning, we hold that subsection 12(2)(b) creates a private cause of action for the recovery of response activity costs.

D

Our construction of § 12 accords with the federal courts' construction of the analogous CERCLA provision. As this Court noted in *Amoco Oil, supra* at 632:

> [A]lthough the general intent of the MERA is similar to that of the CERCLA, our Legislature, in enacting the MERA, sought to provide a state remedy that was more responsive to environmental contamination than the CERCLA, its federal counterpart, providing private parties conducting voluntary cleanups with the right to collect their cleanup costs in remediating contaminated sites from parties responsible for the contamination. Specifically, the legislative history indicates that the MERA was amended, in part, "to expedite cleanup of sites of contamination by providing the DNR with enforcement tools necessary to compel compliance with the act and by providing penalties and positive incentives to encourage polluters to pay for, and promptly implement, cleanup." See House Legislative Analysis, HB 5878, September 12, 1990.

In light of this identity of general purpose, this Court looks to federal decisions considering similar issues under the CERCLA for guidance in interpreting the MERA. *Porter & Heckman, Inc, supra* at 643.

The Legislature clearly modeled § 12 on subsection 107(a) of the CERCLA, which provides that a PRP "shall

be liable for" "any other necessary costs of response incurred by any other person consistent with the national contingency plan." 42 USC 9607(a).[6] At the time the Legislature amended the MERA, it was well established that subsection 107(a) created a private right of action for the recovery of response costs. The United States Supreme Court had recently held that § 107 encompassed suits by individuals against states for money damages.[7] *Pennsylvania v Union Gas Co,*

---

[6] 42 USC 9607(a)  provides, in pertinent part:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

[7] More recently, the United States Supreme Court discussed the statutory basis for the private cause of action under § 107 in determining whether the "necessary costs of response" include attorney fees. *Key Tronic Corp v United States,* 511 US 809; 114 S Ct 1960; 128 L Ed 2d 797

491 US 1; 109 S Ct 2273; 105 L Ed 2d 1 (1989), over-ruled on other grounds *Seminole Tribe of Florida v Florida*, 517 US 44; 116 S Ct 1114; 134 L Ed 2d 252 (1996). The Sixth Circuit Court of Appeals, among others, had recognized the private cause of action four years earlier. *Walls v Waste Resource Corp*, 761 F2d 311, 318 (CA 6, 1985); see, e.g., *Dedham Water Co v Cumberland Farms Dairy, Inc*, 805 F2d 1074, 1078 (CA 1, 1986); *Wickland Oil Terminals v Asarco, Inc*, 792 F2d 887, 890 (CA 9, 1986). Further, the federal courts had held that prior government involvement or a governmentally authorized cleanup program are not preconditions to maintaining a private cause of action for the recovery of response costs under the CERCLA. *Tanglewood East Homeowners v Charles-Thomas, Inc*, 849 F2d 1568, 1575 (CA 5, 1988); *Wickland, supra* at 890-892.

We reject defendants' argument that the MERA statutory scheme compels a different result from that reached by the federal courts under the CERCLA. As defendants correctly note, this Court has deviated from federal decisions interpreting the CERCLA where

---

(1994). Although the majority and the dissent agreed that a private cause of action exists under § 107, the majority characterized the cause of action as "impliedly" authorized by the statute. *Id.* at 816. In his partial dissent, Justice Scalia rejected the majority's characterization, concluding that the statute created an express cause of action. Justice Scalia explained that "[a]n implied cause of action is something quite different from what we have here." *Id.* at 822, citing *Central Bank of Denver, NA v First Interstate Bank of Denver, NA*, 511 US 164, 171; 114 S Ct 1439; 128 L Ed 2d 119 (1994). Similarly, an implied cause of action under Michigan law is one that the courts infer from the fact that the statute provides no adequate means of enforcement of its provisions. *Long, supra* at 583. In this case, although the Legislature did not employ the words "cause of action" in subsection 12(2)(b) of the MERA, we conclude that the Legislature expressly created a private cause of action through the use of other language.

the clear language of the MERA compels a different result. See *Amoco Oil, supra* at 633; *Cipri v Bellingham Frozen Foods, Inc*, 213 Mich App 32, 41-42; 539 NW2d 526 (1995). We decline, however, to reject the federal authority in this case because the clear language of the MERA creates a private cause of action. Further, a contrary construction would result in a state statute that provides fewer incentives for private parties voluntarily to remedy environmental contamination than contained in the CERCLA. The MERA is clearly designed to expand on the remedies available under the CERCLA. *Amoco Oil, supra* at 632-633. Accordingly, the trial court erred in granting summary disposition for defendants J & S Group and Dunbar regarding plaintiff's claims under the MERA.[8]

### III. NEGLIGENCE AND MISREPRESENTATION CLAIMS

In Docket Numbers 203021 and 203023, plaintiff argues that the trial court erred in granting summary disposition for defendants Dunbar and ESE on his negligence and misrepresentation claims. We disagree. This Court reviews de novo the trial court's

---

[8] Defendants' additional arguments to support summary disposition are without merit. Plaintiff did not have to provide sixty days' notice before filing this action. The notice provision, MCL 299.615(3)(a); MSA 13.32(15)(3)(a), applies only to "citizen's suits" for injunctive relief under subsection 15(1)(a) and (b). See *Flanders, supra* at 32-33. Further, plaintiff did not have to plead in his complaint that he provided a copy of it to the Attorney General. Although subsection 16(2) of the MERA, MCL 299.616(2); MSA 13.32(16)(2), requires that "the plaintiff shall, at the time of filing, provide a copy of the complaint to the Attorney General," the requirement is not jurisdictional. The appropriate sanction for a plaintiff's failure to forward the complaint to the Attorney General turns on whether the failure to do so prejudiced the defendant. Cf. *Greene v Product Mfg Corp*, 842 F Supp 1321, 1324 (D Kan, 1993) (considering whether to dismiss an action for the failure to comply with the analogous CERCLA provision, 42 USC 9613[l]). Defendants assert no prejudice resulting from plaintiff's alleged failure to comply with subsection 16(2).

decision whether to grant summary disposition. *Ins Comm'r v Aageson Thibo Agency*, 226 Mich App 336, 340; 573 NW2d 637 (1997).

A

In Docket Number 203021, plaintiff argues that the trial court erred in granting summary disposition for defendant ESE under MCR 2.116(C)(10) because a genuine issue of material fact existed whether ESE negligently failed to disclose information regarding the removal of an underground storage tank and misrepresented whether it observed "free product" while excavating at the former site of the tank. We disagree. A motion for summary disposition under MCR 2.116(C)(10) tests the factual basis underlying a claim and permits summary disposition when, except for the amount of damages, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Gibson v Neelis*, 227 Mich App 187, 190; 575 NW2d 313 (1997). In deciding the motion, the court considers the affidavits, pleadings, depositions, admissions, and other documentary evidence in a light most favorable to the opposing party to determine whether reasonable minds could differ regarding an issue of material fact. *Id.*

To support a negligence claim, a plaintiff must prove that (1) the defendant owed a legal duty to him,[9] (2) the defendant breached the duty, (3) the plaintiff suffered damages, and (4) the breach was the proximate cause of the damages suffered. In this case, plaintiff does not claim that ESE was negligent

---

[9] Defendant ESE concedes that although the city of Cadillac retained it to undertake the Phase II investigation, the investigation was for plaintiff's benefit and plaintiff received copies of all the reports.

in ascertaining the extent of the contamination, but rather argues that ESE negligently failed to inform him that (1) David Dunbar advised ESE that Dunbar had removed an underground storage tank from the property, the contents of which leaked on the property, and (2) ESE observed "free product" in the trench it dug to determine the presence of a storage tank.

The trial court correctly concluded that no genuine issue of material fact existed in this case. Plaintiff proffered no evidence in response to ESE's motion to support his allegation that ESE observed "free product" in the trench. Plaintiff's representations in his affidavit regarding another person's observations do not establish a factual question because they are inadmissible hearsay. *SSC Associates Ltd Partnership v General Retirement System of the City of Detroit*, 192 Mich App 360, 364; 480 NW2d 275 (1991).[10] Further, no genuine issue of material fact existed whether ESE's failure to disclose Dunbar's information constituted a breach because defendant ESE clearly and unequivocally informed plaintiff that an underground storage tank had been removed from the property, that the surrounding soil was contaminated with fuel oil, and that a cleanup would be necessary. Plaintiff does not allege that ESE negligently investigated the potential contamination. Further, the uncontroverted evidence established that plaintiff

---

[10] The trial court properly declined to consider the affidavit of Lars Berentsen, a former employee of ESE, first submitted with plaintiff's motion for reconsideration of the order granting summary disposition. *Apfelblat v Nat'l Bank Wyandotte-Taylor*, 158 Mich App 258, 263; 404 NW2d 725 (1987). Accordingly, we do not consider the affidavit in reviewing the trial court's decision. *Quinto v Cross & Peters Co*, 451 Mich 358, 366, n 5; 547 NW2d 314 (1996).

purchased the property in spite of, rather than on account of, ESE's report. Accordingly, the trial court properly granted summary disposition for defendant ESE on plaintiff's negligence claim.

We also conclude that the trial court properly granted summary disposition for defendant ESE on plaintiff's misrepresentation claim. To support a misrepresentation claim, i.e., fraud, a plaintiff must prove that (1) the defendant made a representation regarding a past or existing material fact, (2) the representation was false, (3) the defendant knew that the representation was false at the time it made it or made it recklessly without knowledge of its truth or falsity, (4) the defendant intended that the plaintiff would act on the representation, (5) the plaintiff acted in reliance on the representation, and (6) the plaintiff suffered injury. *Eerdmans v Maki*, 226 Mich App 360, 366; 573 NW2d 329 (1997).

In this case, plaintiff presented no proof to establish the falsity of ESE's statement that it observed no "free product" in the trench. Further, no genuine issue of fact existed whether ESE either recklessly made statements regarding the groundwater and contamination without knowledge of their truth or falsity or made those statements knowing that they were false. Plaintiff does not allege that ESE employed flawed methods, inaccurately reported test results, or in any way negligently completed the investigation. Accordingly, we conclude that the trial court properly granted summary disposition for defendant ESE on plaintiff's negligence and misrepresentation claims.[11]

---

[11] In light of our decision to affirm the trial court's grant of summary disposition under MCR 2.116(C)(10), we do not address defendant ESE's alternate argument that plaintiff's claims are barred by collateral estoppel.

B

In Docket Number 203023, plaintiff argues that the trial court erred in granting summary disposition for defendant Dunbar under MCR 2.116(C)(7) because the six-year limitation period under the statute of repose, MCL 600.5839; MSA 27A.5839, applies to his negligence claim, not the three-year limitation period contained in MCL 600.5805(8); MSA 27A.5805(8). Because no factual dispute exists, the question whether plaintiff's claim is barred by the statute of limitations is a question of law that this Court reviews de novo. *Travelers Ins Co v Guardian Alarm Co of Michigan*, 231 Mich App 473, 477; 586 NW2d 760 (1998); *Aageson Thibo, supra* at 341.

The statute of repose, MCL 600.5839(1); MSA 27A.5839(1), provides:

> No person may maintain any action to recover damages for any injury to property, real or personal, or for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property, nor any action for contribution or indemnity for damages sustained as a result of such injury, against any state licensed architect or professional engineer performing or furnishing the design or supervision of construction of the improvement, or against any contractor making the improvement, more than 6 years after the time of occupancy of completed improvement, use, or acceptance of the improvement, or 1 year after the defect is discovered or should have been discovered, provided that the defect constitutes the proximate cause of the injury or damage for which the action is brought and is the result of gross negligence on the part of the contractor or licensed architect or professional engineer. However, no such action shall be maintained more than 10 years after the time of occupancy of the completed improvement, use, or acceptance of the improvement.

In *Travelers Ins, supra* at 478, this Court discussed what constitutes an "improvement" under the statute of repose:

> An improvement is a "permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs." [*Pendzsu v Beazer East, Inc*, 219 Mich App 405, 410; 557 NW2d 127 (1996).] The test for an improvement is not whether the modification can be removed without damage to the land, but whether it adds to the value of the realty for the purposes for which it was intended to be used. *Id.* at 410-411. In addition, the nature of the improvement and the permanence of the improvement should also be considered. *Id.* at 411. Furthermore, if a component of an improvement is an integral part of the improvement to which it belongs, then the component constitutes an improvement to real property. *Id.*

We reject plaintiff's argument that the removal of an underground storage tank is the making of an "improvement" for purposes of the statute of repose. By its very nature, the term "improvement" refers to a product, object, or some other tangible item that remains on the real property after the contractor completes his work. The language of the statute clearly evinces this requirement by providing that the statute governs actions for injuries "arising out of the defective and unsafe condition of an improvement" and that the limitation period begins to run "after the time of *occupancy* of the completed improvement, *use*, or *acceptance* of the improvement . . . ." MCL 600.5839(1); MSA 27A.5839(1) (emphasis added). Further, the statute governs claims against state-licensed architects or professional engineers who perform or furnish "the *design* or supervision of *construction* of

the improvement . . . ." *Id.* As this Court recently noted in *Abbott v John E Green Co*, 233 Mich App 194, 200; ___ NW2d ___ (1998):

> The purpose of the statute of repose is to protect engineers, architects, and contractors from stale claims and to eliminate open-ended liability for "defects in workmanship." *Pendzsu, supra* at 410; *Ali v Detroit*, 218 Mich App 581, 587-588; 554 NW2d 384 (1996). The term "workmanship" encompasses not only the quality of the finished product, but the manner of construction as determined by the "art, skill, or technique of [the] workman." *The American Heritage Dictionary: Second College Edition* (1982), p 1391.

In this case, Dunbar did not make an improvement, but rather merely removed an object from the property.

We decline plaintiff's invitation to incorporate the definition of "improvement" contained in the Michigan Construction Lien Act, MCL 570.1101 *et seq.*; MSA 26.316(101) *et seq.*[12] Although this Court must read statutes relating to the same subject or sharing a common purpose together, *Aageson Thibo, supra* at 343, the rule does not apply in this case. The Construction Lien Act is designed to protect the right of all contractors and subcontractors to payment for wages and materials, *M D Marinich, Inc v Michigan Nat'l Bank*, 193 Mich App 447, 453; 484 NW2d 738 (1992), whereas the statute of repose is designed to shield architects, engineers, and contractors from stale claims and relieve them of open-ended liability for defects in workmanship. *Pendzsu, supra* at 410.

---

[12] For purposes of the Construction Lien Act, the term "improvement" means "the result of labor or material provided by a contractor . . . including, but not limited to, . . . clearing, demolishing, excavating, . . . pursuant to a contract." MCL 570.1104(7); MSA 26.316(104)(7).

In light of these differing purposes, we decline to construe the statutes together. Further, to do so would result in a definition of "improvement" far broader than that adopted in *Pendzsu* and *Travelers Ins.* Accordingly, the trial court properly granted summary disposition for defendant Dunbar on plaintiff's negligence claim.[13]

Affirmed in part and reversed in part in Docket Number 203021. Reversed in Docket Number 203022. Affirmed in Docket Number 203023. Plaintiff, as the prevailing party, may recover costs under MCR 7.219 in Docket Numbers 203021 and 203022. Defendant ESE Michigan, Inc., as the prevailing party, may recover costs under MCR 7.219 in Docket Number 203023.

---

[13] We do not address defendant Dunbar's argument that the statute of repose applies only to state-licensed contractors. We note, however, that the United States District Court for the Western District of Michigan rejected the argument in *Matthews v Beloit Corp*, 807 F Supp 1289, 1291 (WD Mich, 1992).