File Name: 04a0100n.06
Filed: November 18, 2004

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | |
|---|---|
| MARK HAELY, | ) |
| | ) |
| Plaintiff-Appellant, | ) |
| | ) ON APPEAL FROM THE |
| v. | ) UNITED STATES DISTRICT |
| | ) COURT FOR THE EASTERN |
| HAAS CORPORATION, | ) DISTRICT OF MICHIGAN |
| | ) |
| Defendant-Appellee. | ) |

Before:       **NELSON**, **SILER**, and **BATCHELDER**, Circuit Judges.

**DAVID A. NELSON**, Circuit Judge.   Where a court has ordered child support payments withheld from an employee's wages, Michigan law protects the employee from being discharged or otherwise penalized by his employer on the basis of the order.   The question raised on appeal in this case is whether the plaintiff employee has presented evidence from which a reasonable jury could conclude that the defendant employer fired him because of a withholding order.   In the record before us, we find no evidence that anyone involved in the decision to terminate the plaintiff's employment was even aware of the withholding order.   We shall therefore affirm the judgment entered by the district court in favor of the employer.

I

The plaintiff, Mark Haely, began working for the defendant, Haas Corporation, in June of 2001. He was assigned to a Haas unit within a General Motors assembly plant in Flint, Michigan. There Mr. Haely was responsible for the water treatment system in the assembly plant's paint department. His duties included the repair of pumps and other equipment.

On August 20, 2001, a Michigan judge ordered Haas Corporation to withhold $416.75 a week from Mr. Haely's pay and to remit the money – earmarked as support for Haely's children – to an official called the "Friend of the Court."

The company did not make its first remittance under the order until September 20, 2001, and Mr. Haely's ex-wife, Leslie Thumm, telephoned before that time to ask where the money was. When the remittance was finally made, the amount proved to have been miscalculated. Ms. Thumm lodged a complaint by telephone with Carlos Humphrey, Haas Corporation's human resources manager and general counsel.

Ms. Leslie Thumm had also telephoned Humphrey's office in July of 2001, when she made inquiries about medical insurance covering the couple's children. (Humphrey asked Haely whether he should divulge the requested information; Haely responded in the affirmative.) The calls made by Ms. Thumm prior to September 20 prompted Humphrey to send Haely an e-mail message, captioned "Confidential Information," that read as follows:

 "Mark: Your ex-wife has been calling our offices asking for various types of information.  Please advise her that all questions should be handled through you.  Thanks, Charlie."

The e-mail was sent on September 13, 2001.

On September 11, 2001, two days before Humphrey's e-mail, Mr. Haely's immediate supervisor, project manager Lisa Perkette, met with Haas Corporation's chief operating officer, Anthony Bull, to tell him about purported problems with Haely's performance on the job.[1]  Mr. Haely, she reported, had failed to respond to an emergency page from a General Motors employee; had fallen asleep on the job and had "disappeared" from the work site for as much as two hours; and had used a company computer for unauthorized sexually oriented purposes.  Moreover, according to Ms. Perkette, Haely had proved unable to master some of the most basic duties of his job, *e.g.* pump repair.

Mr. Bull and Ms. Perkette decided to give Mr. Haely a performance review that would highlight these issues.  They also decided to place Haely under a different supervisor, Mike Dunlop, to receive additional training.  Mr. Bull suggested that they take another look at Haely's performance in 30 days.

The September performance review, which was prepared by Ms. Perkette, discussed the missed page, the misuse of company computers, and, in very general terms, Haely's allegedly sub-par job performance.  The review was dated September 20, 2001.  Sometime

---

[1]The record reflects that Ms. Perkette, not Mr. Bull, initiated the discussion of Mr. Haely's alleged shortcomings.  There is no evidentiary basis for the suggestion in Haely's brief that Bull directed Perkette to "cook up" reasons to fire Haely.

after that date Mr. Dunlop, the new supervisor, is said to have told Bull that Haely "just isn't getting it, he's not capable of doing this job."

During the first part of September, 2001, Haas Corporation's chief executive officer, Thaddeus Fortin, visited the facility at which Mr. Haely worked. According to Mr. Haely, Fortin told him and Ms. Perkette about a man whose "problems with being married and child support from several different ex-wives" caused "administrative nightmares" for the company. Mr. Haely believed that this story was prompted by his own support order. But Mr. Fortin (who denies having had such a conversation) testified unequivocally that he had not been aware of Mr. Haely's child support obligation until after Haely brought suit. Mr. Humphrey's testimony was consistent with Mr. Fortin's lack of knowledge on this score.

On October 10, 2001, Mr. Haely lost his job at Haas Corporation. Ms. Perkette, who delivered the bad news, told Haely that Mr. Bull had instructed her to fire him and that she did not know why. The next day Haely telephoned Mr. Humphrey, who told him that hiring and firing decisions were initiated by the facility manager (*i.e.*, Ms. Perkette) and not by upper management (Mr. Bull). Haely confronted Ms. Perkette with this information, but she insisted that the decision had been made by Bull.

Haely then tape-recorded a conversation with Ms. Perkette in which she maintained that she had been trying without success to learn why Haely had been fired. In an affidavit prepared for this litigation Ms. Perkette stated that she had lied to Haely because she "did not

want to take the blame for Haely's termination." Perkette and Bull both testified that at the time Haely was fired they did not know of the domestic relations withholding order.

In a statement to Michigan's unemployment agency, Mr. Humphrey said that Mr. Haely had been discharged because of "lack of work." Humphrey testified later that he made this false statement so as not to contest Haely's application for unemployment benefits.[2] According to Humphrey, Ms. Perkette informed him in advance that Haely would be fired for sleeping on the job, misuse of the Internet, inability to make pump repairs, and missing a page. The final approval of the termination, Mr. Humphrey testified, came from Mr. Bull.

Mr. Haely sued Haas Corporation in a Michigan court, alleging that his employment had been terminated because of the August 20, 2001, notice of income withholding. Haas removed the action to federal court on diversity grounds and subsequently filed a motion for summary judgment.

The district court granted the summary judgment motion. Applying the burden-shifting framework developed by the United States Supreme Court for federal employment discrimination claims, see *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the district court assumed that Mr. Haely had presented facts sufficient to raise an inference that his discharge was improper. The court held, however, that Haas Corporation had offered lawful reasons for discharging Haely and that there was no genuine issue of fact as to

---

[2]Mr. Humphrey's deposition testimony suggests that he believed a discharge for cause would disqualify Mr. Haely from receiving unemployment benefits. This belief is not consistent with Michigan law. See Mich. Comp. Laws § 421.29.

whether those reasons were pretexts for unlawful conduct. Mr. Haely moved for reconsideration, but the motion was denied. This timely appeal followed.

II

Mr. Haely sued Haas under Michigan Compiled Laws § 552.623(1), which provides as follows:

> "A source of income shall not use a notice of income withholding as a basis for refusing to employ, discharging, taking disciplinary action against, or imposing a penalty against a payer. A source of income who refuses to employ, discharges, disciplines, or penalizes a payer in violation of this section is guilty of a misdemeanor . . . and shall be required to make full restitution to the aggrieved payer, including reinstatement and back pay."

A "payer" is a person who has been ordered to pay child or spousal support, and a "source of income" is a payer's employer or debtor. Mich. Comp. Laws § 552.602(u), (bb). Haas Corporation thus violated § 552.623(1) if it discharged Haely because of the withholding order.[3]

---

[3]Haas has not disputed that § 552.623(1) creates a private right of action. Under Michigan law, a statute may be enforced by private action if "(1) the statute expressly creates a private cause of action or (2) a cause of action can be inferred from the fact that the statute provides no adequate means of enforcement of its provisions." *Pitsch v. ESE Michigan, Inc.*, 593 N.W.2d 565, 570 (Mich. App.) (internal quotation marks omitted), *appeal denied*, 595 N.W.2d 844 (Mich. 1999). We think a Michigan court would interpret the language of § 552.623(1) – language providing that a violator of the statute "shall be required to make full restitution to the aggrieved payer, including reinstatement and back pay" – as expressly creating a private cause of action. See *id.* at 571-72, where the Michigan Court of Appeals held that a private right of action was created by a statute providing that certain persons "shall be liable for . . . necessary costs of response activity incurred by any other person . . . ."

We are aware of no judicial decisions, state or federal, applying § 552.623(1). But the parties suggest – and the district court agreed – that cases brought under this statute should be analyzed under the same approach as that used in federal employment discrimination cases. We see no reason to disagree. Under the particular circumstances presented here, however, it does not seem to us that the *McDonnell Douglas* burden-shifting mechanism comes into play. This is so because, in our view, facts that are not genuinely in dispute establish that the decision to fire Mr. Haely was made by persons who had no knowledge of his child support obligation. It follows that Haas Corporation is entitled to judgment as a matter of law.

There is a genuine factual dispute as to whether it was Ms. Perkette or Mr. Bull who was the driving force behind Mr. Haely's discharge. The dispute is not material, however, because there is no evidence that either of these individuals knew about the withholding order at the time Haely was fired. Perkette and Bull both denied having such knowledge, and their testimony on this point stands uncontradicted.

Mr. Humphrey, of course, was aware of the withholding order. And perhaps a reasonable jury could question Mr. Fortin's testimony that he lacked awareness of the order, given Mr. Haely's averment that Fortin told him a story about "administrative nightmares" caused by another employee's child support obligations.

Nonetheless, as we see it, there is no genuine dispute as to whether Messrs. Humphrey and Fortin, or either of them, had anything to do with the decision to fire Mr. Haely. Each

of the two men testified that he did not, and we can find no evidence supporting a contrary conclusion.

Mr. Haely suggests that if Mr. Bull was the driving force behind the discharge, as Ms. Perkette asserted in her tape-recorded conversation with Haely, a jury could infer that Bull's action was influenced by Mr. Humphrey, Mr. Fortin, or both. We are not persuaded that such an inference can be justified on this record.

For one thing, it is doubtful that the evidence can support a finding that Mr. Fortin or Mr. Humphrey wanted Mr. Haely to be fired. The story that Fortin told Haely was about an employee who "had been married and divorced from several different women and . . . had children with several different women." Unlike this other employee, Mr. Haely had only one ex-wife and was subject to only one withholding order. It requires a substantial leap of logic, we believe, to infer from Mr. Fortin's alleged remark about the other employee's situation creating an "administrative nightmare" that Fortin (who testified unequivocally that he was not even aware of Haely's support obligation) wanted to rid the company of Mr. Haely.

As for Mr. Humphrey, he testified without contradiction that he did not personally handle payroll deductions. Further, he denied that the withholding order placed any significant burden on his office: "Those deductions, we do it every day. They're standard. They're so low in the clerical work . . . they're just not something that even concerns the company." Except possibly for the September 13 e-mail, there is no evidence to the contrary.

Mr. Haely contends that the September 13 communication demonstrates Humphrey's frustration with having to handle the withholding of support from Haely's wages. But the e-mail (which was sent a week before Haas Corporation's first remittance under the withholding order) dealt only with Ms. Thumm's requests for information; the link to any burden imposed on the company or Mr. Humphrey by the withholding order is tenuous at best.

Even if a reasonable jury could conclude that Fortin or Humphrey wanted to get rid of Haely, there is no evidence that either man communicated such a desire to Bull. It is true that Fortin, Humphrey, and Bull had offices located in Haas' Philadelphia headquarters and that Bull reported directly to Fortin. But these reeds are too flimsy, we believe, to support a rational jury's rejection of the evidence that Fortin knew nothing about Haely's discharge until after the fact, that Humphrey did not discuss the withholding order with Fortin or Bull, that Humphrey "was not part of" conversations concerning Haely's discharge, and that Bull decided to discharge Haely "based on input from [operations manager] Scott Chapman, Lisa Perkette, [and technical manager] Mike Dunlop, primarily."

Mr. Humphrey's veracity may be open to question in light of the fact that he apparently tried to help Mr. Haely by fudging the reason for his discharge when Haely applied for unemployment benefits. We see no basis, however, for discrediting Mr. Bull's

testimony that Humphrey had nothing to do with the decision to fire Haely.[4]  There is simply no evidence to suggest that Humphrey influenced that decision in any way.

At the end of the day, the most that can be inferred from Mr. Haely's evidence is that Mr. Fortin considered multiple withholding orders an "administrative nightmare," that Mr. Humphrey was annoyed by the telephone calls from Haely's ex-wife, and that Fortin and Humphrey worked in close physical proximity to Mr. Bull.  Given the testimony of Fortin, Humphrey, and Bull that the first two men played no part in the decision to discharge Haely, and given Bull's testimony that he did not know about the withholding order until after the discharge, we do not think a rational jury could find by a preponderance of the evidence that the withholding order lay behind Haely's discharge.  Had the case gone to a jury on this record, and had the jury returned a verdict in favor of Mr. Haely, the defendant company would have been entitled to a judgment *n.o.v.*

---

[4]Mr. Bull's deposition transcript includes the following exchange:

"Q.    Didn't Charlie Humphrey make a request to you to somehow get rid of Mr. Haely?

A.    No.

Q.    Didn't Mr. Humphrey tell you that Mr. Haely was becoming a bit of a burden because of his child support withholding changes and the fact that he had a wife, an ex-wife, who was very persistent and unrelenting in the area of complaining about late withholding checks being sent and inaccurate amounts?

A.    Absolutely not."

**AFFIRMED**.