*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SAMUEL J. RANDALL,

      Plaintiff-Appellee,

v

MICHIGAN HIGH SCHOOL ATHLETIC
ASSOCIATION, GRAND RAPIDS CHRISTIAN
HIGH SCHOOL, GRAND RAPIDS CHRISTIAN
SCHOOLS, ST. FRANCIS HIGH SCHOOL,
GRAND TRAVERSE AREA CATHOLIC
SCHOOLS, BAY HOCKEY ASSOCIATION,
RYAN FEDORINCHIK,

      Defendants,

and

ANTHONY POLAZZO and METROPOLITAN
HEALTH CORPORATION,

      Defendants-Appellants.

FOR PUBLICATION
November 19, 2020
9:25 a.m.

No. 346135
Kent Circuit Court
LC No. 18-001891-NI

---

SAMUEL J. RANDALL,

      Plaintiff-Appellant,

v

MICHIGAN HIGH SCHOOL ATHLETIC
ASSOCIATION, ANTHONY POLAZZO,
METROPOLITAN HEALTH CORPORATION,

      Defendants,

and

No. 346476
Kent Circuit Court
LC No. 18-001891-NI

-1-

GRAND RAPIDS CHRISTIAN HIGH SCHOOL,
GRAND RAPIDS CHRISTIAN SCHOOLS, ST.
FRANCIS HIGH SCHOOL, GRAND
TRAVERSE AREA CATHOLIC SCHOOLS,
BAY HOCKEY ASSOCIATION, RYAN
FEDORINCHIK,

         Defendants-Appellees.

Before:  K. F. KELLY, P.J., and FORT HOOD and SWARTZLE, JJ.

SWARTZLE, J.

Youth sports offer extensive benefits to kids—comradery, discipline, exercise, and self-esteem, just to name a few.  There can be a dark side to youth sports, however, and one of the darkest is the possibility of short- and long-term injury and harm from concussions.  In 2012, our Legislature enacted the "concussion-protection statute," 2012 PA 342, to help protect our youth from this specific risk of harm.  The statute imposes various duties on coaches and other covered adults, including training about concussions and the requirement to remove a youth from an athletic activity who is suspected of suffering a concussion.

Plaintiff sued his coach, trainer, and various institutional entities, alleging that they failed to remove him from a youth hockey game after he showed obvious signs of a concussion.  Defendants have denied breaching any duty.  On appeal, we clarify the legal duties imposed by the Legislature on coaches and other covered adults and entities with respect to a youth who is suspected of suffering a concussion during an athletic activity, and we affirm in part and vacate in part the trial court's rulings on summary disposition and remand both appeals to the trial court for further proceedings.

I.  BACKGROUND

Plaintiff, Samuel Randall, sued defendants, the Michigan High School Athletic Association ("MHSAA"), Grand Rapids Christian High School, Grand Rapids Christian Schools, St. Francis High School, Grand Traverse Area Catholic Schools, Anthony Polazzo, Metropolitan Health Corporation, Ryan Fedorinchik, and the Bay Hockey Association, over a concussion that he allegedly suffered while participating as a youth athlete in a hockey game.  The orders on appeal do not concern his claims against the MHSAA, Grand Rapids Christian High School, or Grand Rapids Christian Schools, and those parties are not involved in these appeals.  For clarity, this opinion will refer to St. Francis High School, Grand Traverse Area Catholic Schools, Bay Hockey Association, and Fedorinchik collectively as the "Association defendants."

A brief preliminary note about the appellate record.  In support and opposition to the motions for summary disposition, the parties relied on plaintiff's deposition testimony, the medical records completed by the athletic trainer, and video evidence.  Plaintiff's briefs on appeal, however, are not restricted to this evidence and instead cite extensively from depositions of witnesses taken after the motions were decided.  We decline to consider this evidence, as it was

not presented to the trial court with respect to the rulings now on appeal. See *Pena v Ingham Co Rd Comm*, 255 Mich App 299, 310; 660 NW2d 351 (2003). With that said and as explained below, this additional evidence might be relevant to future proceedings in this case.

## A. PLAINTIFF'S INJURY

Plaintiff played goalie for a youth hockey team run by St. Francis High School and the Bay Hockey Association. The events at issue in this lawsuit occurred during a hockey game between plaintiff's team and a team operated by the Grand Rapids Christian Schools. Polazzo, an employee of Metro Health, served as athletic trainer for both hockey teams during the game.

Plaintiff was involved in two separate collisions during the game. Plaintiff testified that, during the second period, a player from the opposing team struck him in the head with an elbow. Plaintiff claimed that, as a result of this blow to the head, he lost consciousness and fell to the ice. Plaintiff obtained a video of this first collision and posted it on social media. The video was approximately 30 seconds long, and while it showed the collision, it ended as soon as plaintiff was hit and therefore did not confirm that he lost consciousness on the ice. Plaintiff testified that he did not remember falling after the first collision, but when he regained consciousness, he found himself lying on the ice.

The length of time plaintiff was lying on the ice—if at all—is highly contested. In his complaint, plaintiff alleged that he "remained on the ice—unresponsive—for approximately four minutes." During his deposition, however, plaintiff denied any personal knowledge regarding how long he was unconscious. Instead, plaintiff stated that two spectators watching the game from the stands—specifically, Jonathan Ellis and Mark Stevenson—told him that he was unconscious for four minutes. Plaintiff agreed during his deposition that any person watching the game, including the spectators in the stands (which included his parents), would have been able to see how long he was on the ice after the first hit. Yet, plaintiff has not alleged in his pleadings, briefs, or deposition testimony that his parents saw the first hit or saw him on the ice for approximately four minutes.

After the first collision, Polazzo went on the ice to check on plaintiff. Plaintiff alleged in his complaint that Polazzo did not perform any test to ascertain his medical condition or, specifically, whether plaintiff exhibited any symptoms of a concussion. During his deposition, however, plaintiff admitted that Polazzo assessed him to determine whether plaintiff could continue to play.

Plaintiff testified that he felt dizzy after the first collision. He admitted, however, that he wanted to remain in the game and that he told Polazzo, "I think I'm good." He did not recall experiencing any sensitivity to light at that time, and he stated that he would not have stayed in the game if he had experienced such sensitivity, given the brightness of the lights and reflectivity of the ice. He remembered that Polazzo told him that if he started to get a headache or feel dizzy, or if he felt like he could not continue play, he should alert Polazzo immediately.

Polazzo later completed a three-page form that documented his visit to plaintiff on the ice. One page, labeled "Cognitive & Physical Evaluation," included an area for documenting the evaluation of an athlete's symptoms, as well as an area for documenting an athlete's cognitive and physical condition. According to the form, plaintiff reported a mild headache to Polazzo, but this

subsided as the evaluation progressed. Plaintiff also purportedly reported experiencing mild dizziness when his head hit the ice, but denied any dizziness during the on-ice evaluation. Plaintiff purportedly denied other symptoms of a concussion, including pressure in the head, neck pain, nausea or vomiting, blurred vision, balance problems, or sensitivity to light or noise. Polazzo recorded on the cognitive-assessment portion of the form that plaintiff "knew where he was [and] what happened," and that he was "able to comprehend" and "was not delayed in answering" Polazzo's questions.

Another page of the form, labeled "Sports Medicine Athletic Injury Evaluation," contained Polazzo's narrative description of plaintiff's injury: "Athlete was hit and taken down when he said his head hit the ice. He was wearing a helmet, goalie. He stayed down on ice until athletic trainer got to him." Regarding his evaluation of the injury, Polazzo wrote:

> Eval. revealed pain where athlete's head made contact with ice, in helmet. He said he had a headache after hitting the ice, but it started to go away while talking to him. He denied any dizziness, feeling in a fog, not feeling right, or troubles with light sensitivity. He was asked if he thinks he can continue and he said he could. He was told if he starts to get a headache, feel dizzy, feel like he can't think straight to tell the ref or motion to athletic trainer immediately.

It is uncontested that, after he visited plaintiff on the ice, Polazzo returned to the bench, plaintiff remained in net, and the game resumed.

Plaintiff testified that, at some later point, he tried to signal Polazzo that he wanted to come out. "I just remember looking at him and like shaking my head because I was dizzy, like losing balance," plaintiff testified. He did not come off the ice on his own, however, because he thought Polazzo was going to stop play. The opposing team scored a goal, play stopped, and yet plaintiff remained on the ice.

Shortly after the goal (and about five or six minutes after the first hit), plaintiff took a knee to the head. He alleged in his complaint that he remained conscious, but he removed himself from the game because his head hurt, and he had vision problems. During his deposition, however, plaintiff testified that it was his father who "pulled me off the ice" when he "opened the door during the whistle and yelled and told me to come off the ice."

Polazzo's evaluation form confirmed that plaintiff signaled that he wanted to come off the ice, and that plaintiff was involved in a second collision. Polazzo claimed, however, that plaintiff did not signal until after the opposing team scored a goal against him. Polazzo wrote on the form:

> After missing a shot that went passed [sic] him he motioned to the athletic trainer. [Athletic trainer] went to coach to instruct him the goalie was done. After the athlete came off the ice he went to the locker room. In the locker room Dad said he had trouble walking down the hallway. Talking to him he also said he started to get a headache and not feel right. Dad took him to the hotel and was instructed on home care and when to take to emergency room.

-4-

Polazzo further wrote on the form that he believed that plaintiff had suffered a concussion. He marked plaintiff's initial treatment as "removed from game" and recommended that plaintiff "Follow up with physician."

## B. THE LAWSUIT

Plaintiff sued the MHSAA, Grand Rapids Christian High School, Grand Rapids Christian Schools, Polazzo, St. Francis High School, Grand Traverse Area Catholic Schools, and the Bay Hockey Association. Substantively, plaintiff alleged that Polazzo was negligent because he failed to "properly treat and evaluate" plaintiff for injuries, including "a concussion or concussive symptoms," and because Polazzo allowed plaintiff "to return to competition after the first collision." Plaintiff further alleged that Polazzo was negligent per se under MCL 333.9156(3) because he failed to remove plaintiff from the hockey game "notwithstanding his obvious signs and/or symptoms of sustaining a concussion—specifically the approximately four minutes he remained on the ice." He alleged claims against Polazzo for ordinary negligence and "negligence per se"; claims against Grand Rapids Christian High School and Grand Rapids Christian Schools under a theory of respondeat superior, as well as negligent hiring, retention, and supervision; claims against St. Francis High School (purportedly operated, managed, and controlled by Grand Traverse Area Catholic Schools) for negligence and respondeat superior; a claim against the MHSAA for respondeat superior; and claims against the Bay Hockey Association for ordinary negligence and respondeat superior, as well as negligent hiring, training, and supervision.

Polazzo moved for summary disposition in lieu of answering plaintiff's complaint. In his motion, Polazzo asserted that he was certified as an athletic trainer and qualified as a licensed-health professional under the Michigan Public Health Code. Polazzo argued that, although plaintiff styled the claims against him as ordinary-negligence claims, his claims actually sounded in medical malpractice. He argued that plaintiff was required to follow the procedural requirements for filing medical-malpractice actions set forth in MCL 600.2912b and MCL 600.2912d, including serving a notice of intent to file claim, waiting 182 days, and filing an affidavit of merit from a qualified expert along with his complaint. Polazzo argued that the appropriate remedy for plaintiff's failure to comply with these statutory requirements was dismissal of the claims against him.

In response to the motion, plaintiff insisted that he had filed an "ordinary negligence action," and argued that the concussion-protection statute "applies equally to medical experts and lay persons, such as coaches, volunteers, or referees." Plaintiff further argued that Polazzo "did not perform any medical tests to determine if Plaintiff had suffered a concussion," and that he did not, therefore, exercise any medical judgment with regard to plaintiff's injury.

Plaintiff subsequently filed his first-amended complaint, adding Metro Health as a party. He alleged that Polazzo was an employee or agent of Metro Health, and that the latter was liable for Polazzo's negligence under a theory of respondeat superior. Plaintiff also added a claim against the MHSAA for negligent hiring, training, and supervision related to its game officials.

The trial court denied Polazzo's motion for summary disposition. The parties had not yet taken the deposition of either plaintiff or Polazzo, and the parties had not provided the trial court with the three-page form that documented Polazzo's visit to plaintiff on the ice. Given the paucity

of the record and plaintiff's well-pleaded allegations, the trial court concluded that dismissal was not warranted:

> According to the First Amended Complaint, Randall was unconscious for "four minutes" after he suffered the first blow to the head. Polazzo entered the ice to talk to Randall, did not perform any medical tests, and did [not] stop Randall from returning to the ice. Based on the information provided, Polazzo did not perform a full evaluation and did not provide written clearance authorizing Randall's return to athletic activity. Although this claim is against a licensed medical professional, Randall alleges that the claim arises from a statutory violation of MCL 333.9156, which applies to coaches, volunteers, and other adults participating in an athletic event. The claim is not alleging inappropriate written clearance or judgment which required a higher level of medial expertise. Based on this statute, it is immaterial whether Polazzo is a medical expert.

> Accordingly, this claim does not sound in medical malpractice and was filed appropriately. Based upon the well-plead facts, a sufficient legal claim exists. Additionally, a genuine issue of material fact exists. Summary Disposition is inappropriate on this matter.

Plaintiff then filed his second-amended complaint. He alleged the same claims as recounted earlier, and he added Fedorinchik as a party, asserting claims against the coach for ordinary negligence and "negligence per se".

Discovery ensued under the trial court's scheduling order. Prior to the end of discovery, Polazzo and Metro Health moved for summary disposition under MCR 2.116(C)(7), (C)(8), and (C)(10). Relying primarily on plaintiff's deposition testimony, Polazzo again argued that plaintiff's claims against him sounded in medical malpractice, rather than ordinary negligence, and that plaintiff had failed to follow the procedures applicable to medical-malpractice claims. In turn, Metro Health argued that the trial court should dismiss plaintiff's respondeat-superior claim against it, if the trial court dismissed plaintiff's claims against Polazzo. Metro Health and Polazzo attached a copy of plaintiff's deposition transcript to the brief supporting their motion. They argued that plaintiff's testimony confirmed that Polazzo evaluated plaintiff on the ice to determine whether plaintiff should be allowed to play or be removed for further medical assistance.

Plaintiff responded to the motion by again arguing that his claim against Polazzo sounded in ordinary negligence, not medical malpractice. Plaintiff conceded that Polazzo was a medical professional who could be sued for medical malpractice, but argued that his claims against Polazzo did not sound in medical malpractice because they did not raise questions of medical judgment that were beyond the realm of common knowledge and experience.

Plaintiff also argued that, as a matter of logic, his claim against Polazzo could not sound in medical malpractice because "no medical examination took place." Plaintiff argued that the question was not whether Polazzo provided negligent medical care, but whether Polazzo committed ordinary negligence by failing to provide plaintiff with *any* medical care. Plaintiff conceded that Polazzo "entered the ice and talked to" him after the first collision. Yet, plaintiff continued to insist that Polazzo "did not perform any medical tests." Plaintiff argued that "Polazzo

*never* treated Plaintiff" because he "simply went out onto the ice and asked Plaintiff if he wished to continue playing." Plaintiff further argued that any lay juror could understand the allegations of negligence, namely that Polazzo witnessed him sustain a violent collision causing his head to make forceful contact with the ice and that he lay on the ice, unresponsive, for approximately four minutes.

Plaintiff continued to argue that the duties set forth in the concussion-protection statute apply "equally to those with and without medical knowledge" and that corrective action is always required "if a concussion is suspected." According to plaintiff, medical judgment is only implicated under the statute *after* an athlete is removed from athletic activity. Finally, plaintiff argued that Metro Health did not challenge that Polazzo was its agent and, accordingly, argued that if Polazzo was potentially liable, then Metro Health was also potentially liable under a theory of respondeat superior.

In reply, Polazzo and Metro Health pointed out that there was no evidence in the trial-court record that plaintiff had lain on the ice, unresponsive, for a period of four minutes. At this point in the case, plaintiff had not provided the trial court with any documentary evidence, video evidence, or testimony from any other individual regarding the duration of his loss of consciousness. Instead, plaintiff relied only on his hearsay testimony that Ellis and Stevenson told him that he was unconscious for a period of four minutes.

For their part, the Association defendants also moved for summary disposition under MCR 2.116(C)(8) and (C)(10). These defendants argued that Polazzo evaluated plaintiff immediately after the first collision, observed no signs of a concussion during that evaluation, and cleared plaintiff to continue play. The Association defendants further argued that Polazzo was an independent medical professional, and that Fedorinchik, who was not a medical professional, justifiably relied on the on-ice evaluation that Polazzo conducted. The Association defendants attached to their supporting brief the entire transcript of plaintiff's deposition testimony, along with the three-page form completed by Polazzo that documented his visit to plaintiff on the ice.

Although several parties attached the entire transcript of plaintiff's deposition to their motions and supporting briefs, plaintiff did not offer an affidavit from either of his parents or the two witnesses he named, attesting that plaintiff had lain on the ice for approximately four minutes after the first collision. Instead, plaintiff relied on his own lack of personal knowledge regarding how long he had lain on the ice, and on the hearsay statements allegedly made to plaintiff by third parties.

## C. TRIAL-COURT RULINGS AND INTERLOCUTORY APPEALS

The trial court granted summary disposition in favor of the Association defendants under MCR 2.116(C)(10). The trial court held:

> In the current case, on December 17, 2016, Randall was competing in a hockey game for the Bay Hockey Team. Bay Hockey is primarily staffed by [St. Francis] staff and is coached by Fedorinchik. In the second period, Randall was hit, fell to the ice, and struck the left side of his head. Randall contends that he was unconscious on the ice for four minutes. Polazzo, a certified medical trainer,

evaluated Randall and cleared Randall to continue playing. Randall continued to play and was involved in a second collision which Randall alleges caused damage causing him to leave the game.

No genuine issue of material fact exists. Randall has failed to provide documentary evidence that Fedorinchik breached his ordinary duty of care to Randall. Consequently, Randall has failed to provide documentary evidence that [St. Francis, Grand Traverse Area Catholic Schools, or the Bay Hockey Association] breached their duty of care or are liable through the doctrine of respondeat superior. Randall only provides his deposition testimony, a video of the two hits, and a copy of the consent form. These exhibits do not establish that Randall was laying on the ice for four minutes. Further, [the Association defendants] provide documentation that Polazzo cleared Randall to continue playing after Randall said, "I think I'm good."

On the issue of negligence per se, Randall has failed to provide documentary evidence that Fedorinchik had reason to suspect that Randall sustained a concussion. Further, the evidence shows that Polazzo cleared Randall to continue playing. Accordingly, summary disposition is appropriate as to the claims against [the Association defendants].

In a second opinion issued the same day, the trial court denied Metro Health and Polazzo's motion for summary disposition, holding:

As described in this Court's previous Opinion and Order, although the claim is against a medical professional, the allegations do not require a higher level of medical expertise "beyond the realm of common knowledge and expertise." The question is not whether Polazzo was negligent in his medical treatment, but whether he was negligent in failing to provide medical treatment. A question of material fact exists as to the remaining elements of the claim. Accordingly, summary disposition is not appropriate as to Counts I, II, or III against Polazzo and Metro Health.

In a third opinion issued the same day, the trial court granted summary disposition in favor of Grand Rapids Christian High School and Grand Rapids Christian Schools, and those parties were dismissed from the case. But because several claims survived summary disposition, discovery continued and the parties took additional depositions.

These interlocutory appeals followed. In Docket No. 346135, Polazzo and Metro Health appealed by leave granted the trial court's order denying their motion for summary disposition under MCR 2.116(C)(7). See *Randall v MHSAA*, unpublished order of the Court of Appeals, entered March 26, 2019 (Docket No. 346135). In Docket No. 346476, plaintiff appealed by leave granted the trial court's order granting summary disposition under MCR 2.116(C)(10) in favor of the Association defendants. See *Randall v MHSAA*, unpublished order of the Court of Appeals, entered March 26, 2019 (Docket No. 346476). This Court consolidated the two appeals and stayed the trial-court proceedings pending resolution of the appeals. See *Randall v MHSAA*, unpublished order of the Court of Appeals, entered March 26, 2019 (Docket Nos. 346135; 346476). This Court

denied plaintiff's application for leave to appeal the trial court's decision granting summary disposition in favor of Grand Rapids Christian High School and Grand Rapids Christian Schools, and those defendants are not involved in these appeals.

## II. ANALYSIS

### A. STANDARD OF REVIEW

"This appeal involves various legal questions of statutory construction and the distinction between ordinary negligence and medical malpractice, all of which we review de novo." *LaFave v Alliance Healthcare Servs, Inc*, __ Mich App __; __ NW2d __ (2020) (Docket No. 345986); slip op at 3. With respect to whether the Legislature created a private statutory right of action under MCL 333.9156(3), our interpretation of the statute is likewise done de novo. *Long v Chelsea Comm Hosp*, 219 Mich App 578, 581-582; 557 NW2d 157 (1996); see also *Pitsch v ESE Michigan, Inc*, 233 Mich App 578, 586; 593 NW2d 565 (1999). Moreover, "whether a defendant owes a plaintiff a duty of care is a question of law" that we review de novo. *Sabbagh v Hamilton Psychological Servs*, 329 Mich App 324, 348; 941 NW2d 685 (2019).

Similarly, we review de novo the trial court's summary-disposition rulings. *LaFave*, slip op at 2. Although Polazzo and Metro Health moved for summary disposition under MCR 2.116(C)(7) and (C)(8), "[i]n determining whether the nature of a claim is ordinary negligence or medical malpractice . . . a court does so under MCR 2.116(C)(7)." *Bryant v Oakpointe Villa Nursing Ctr, Inc*, 471 Mich 411, 419; 684 NW2d 864 (2004). For their part, the Association defendants moved for summary disposition under MCR 2.116(C)(8) and (C)(10), and the trial court granted the motion under MCR 2.116(C)(10). "Where a motion for summary disposition is brought under both MCR 2.116(C)(8) and (C)(10), but the parties and the trial court relied on matters outside the pleadings, as is the case here, MCR 2.116(C)(10) is the appropriate basis for review." *Silberstein v Pro-Golf of America, Inc*, 278 Mich App 446, 457; 750 NW2d 615 (2008).

### B. THE CONCUSSION-PROTECTION STATUTE

In 2012, our Legislature addressed the problem of concussions in youth sports by enacting the concussion-protection statute. Relevant to this dispute, the first two sentences of MCL 333.9156(3) provide:

> A coach or other adult employed by, volunteering for, or otherwise acting on behalf of an organizing entity during an athletic event sponsored by or operated under the auspices of the organizing entity shall immediately remove from physical participation in an athletic activity a youth athlete who is suspected of sustaining a concussion during the athletic activity.

> A youth athlete who has been removed from physical participation in an athletic activity under this subsection shall not return to physical activity until he or she has been evaluated by an appropriate health professional and receives written clearance from that health professional authorizing the youth athlete's return to physical participation in the athletic activity.

The Legislature defined an "appropriate health professional" as "a health professional who is licensed or otherwise authorized to engage in a health profession under [MCL 333.16101 *et seq.*] and whose scope of practice within that health profession includes the recognition, treatment, and management of concussions." MCL 333.9155(4)(a).

## C. PRIVATE STATUTORY CAUSE OF ACTION FOR

## VIOLATING THE CONCUSSION-PROTECTION STATUTE?

The first question we consider on appeal is whether our Legislature "either expressly or by implication, intended to create" a private statutory cause of action for violation of the concussion-protection statute. *Office Planning Group, Inc v Baraga-Houghton-Keweenaw Child Dev Bd*, 472 Mich 479, 498; 697 NW2d 871 (2005). This is important to clarify at the outset because, generally speaking, a plaintiff cannot make a viable claim for money damages based strictly on violation of a statute unless the Legislature provides for a private statutory cause of action. *Lash v Traverse City*, 479 Mich 180, 197; 735 NW2d 628 (2007); see also *People v Anstey*, 476 Mich 436, 445 n 7; 719 NW2d 579 (2006) ("Because the Legislature did not provide a remedy in the statute, we may not create a remedy that only the Legislature has the power to create."). This question is distinct from the separate question of whether violation of a statute factors into a common-law negligence cause of action, a question that we consider in the next section.

Prior to oral argument on appeal, neither the parties nor the trial court addressed the question of whether our Legislature created a private statutory cause of action for violation of the concussion-protection statute. On its own motion following oral argument, this Court ordered the parties to file supplemental briefs addressing the following questions: "(1) is there a private cause of action for violation of MCL 333.9156(3); and (2) if there is not a private cause of action, how does this impact plaintiff's claims for monetary damages?" *Randall v MHSAA*, unpublished order of the Court of Appeals, entered August 14, 2020 (Docket Nos. 346135; 346476).

In their supplemental briefs, the parties acknowledge that there is no express private statutory cause of action, and our own review of the statute confirms this. The parties disagree, however, on whether the statute creates, by implication, a private cause of action. We conclude that it does not. First, in addition to there being no language in the statute explicitly creating a private statutory cause of action, there is likewise no language from which a necessary inference could be drawn that the Legislature nevertheless intended there to be one. There is simply no ambiguity in the statute on this question, and like all questions of statutory construction, where our Legislature has clearly spoken on a matter within its sole constitutional authority, it is outside of our authority to provide otherwise. *Lash*, 479 Mich at 194; *D'Agostini Land Co LLC v Dep't of Treasury*, 322 Mich App 545, 560; 912 NW2d 593 (2018).

Second, even if we were to assume that there was some ambiguity in the concussion-protection statute on this score, there is not a sufficient basis to infer a private statutory cause of action. Courts have held that where the Legislature has provided other means for enforcing a statute's provisions, inferring a private statutory cause of action for money damages is not warranted. See, e.g., *Lash*, 479 Mich at 196; *Pitsch*, 233 Mich App at 586-587. As relevant here, the Legislature has provided that violations of the Public Health Code can be criminally prosecuted. See MCL 333.1299(1) ("A person who violates a provision of this code for which a

penalty is not otherwise provided is guilty of a misdemeanor"). Furthermore, the Public Health Code vests the Department of Health and Human Services with broad authority to enforce provisions of the code, including investigating, MCL 333.2241(1); ordering immediate corrective action, MCL 333.2251(1); seeking injunctive relief, MCL 333.2255; and assessing civil penalties, MCL 333.2262(1).

And third, the existence of a common-law remedy for an actor's alleged bad acts further counsels against inferring a statutory remedy here. In reconciling prior case law, our Supreme Court explained in *Lash* that "where no common-law remedy existed" for an actor's conduct, "the remedy provided by statute was the sole remedy." *Lash*, 479 Mich at 191-192. Whether the inverse of the statement in *Lash*—i.e., where a common-law remedy does exist, no statutory remedy should be inferred—is a categorical rule or merely a practical guide need not be resolved here, because even if it is only the latter, our common-law negligence law provides private actors with sufficient remedies for violation of the concussion-protection statute, as explained below. Accordingly, we conclude that the concussion-protection statute does not create, explicitly or by implication, a private statutory cause of action.

## D. COMMON-LAW CAUSES OF ACTION FOR

## VIOLATING THE CONCUSSION-PROTECTION STATUTE

We turn next to plaintiff's common-law causes of action. These claims take several forms, although all sound in negligence. To make a negligence claim, "a plaintiff must prove that (1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the legal duty, (3) the plaintiff suffered damages, and (4) the defendant's breach was a proximate cause of the plaintiff's damages." *Hill v Sears, Roebuck & Co*, 492 Mich 651, 660; 683 NW2d 587 (2004). How plaintiff's negligence-based causes of action interact with the concussion-protection statute is critical to an understanding of this case.

### 1. LEGAL DUTY ARISING FROM STATUTE

Any negligence-based claim must, as its starting point, identify a legal duty owed by one to another. If there is no duty, then there is no negligence. See *Sabbagh*, 329 Mich App at 349-350. The Legislature can create a duty by statute, but not every statute creates such a duty. To determine whether a statute creates a particular duty with respect to a particular party, courts generally consider two questions: (1) did the Legislature intend that the statute would prevent the type of injury and harm actually suffered by the party; and (2) did the Legislature intend that the party was within the class of persons protected by the statute? *Wood v City of Detroit*, 323 Mich App 416, 422 n 3; 917 NW2d 709 (2018); 18A Michigan Civil Jurisprudence, Negligence, § 92, p 200. If the answers to both are *yes*, then a legal duty arises from the statutory enactment. See *Wood*, 323 Mich App at 422 n 3.

Upon review of the concussion-protection statute and relevant law, we conclude that the statute imposes a legal duty on the part of coaches and other covered adults to remove a youth athlete who is suspected of sustaining a concussion from further involvement in covered athletic activities. The statute defines a narrow class of persons needing protection—youth athletes involved in certain athletic activities. 57A Am Jur 2d, Negligence, § 729, p 703 ("The violation

of a statute or ordinance is actionable negligence . . . only as to those persons for whose benefit or protection it was enacted."). Thus, this is not a statute intended to benefit the public at-large. *Id.* § 726, p 701. Moreover, the statute is intended to protect youth athletes from a specific type of injury and harm—short- and long-term detrimental health effects from concussions. The statute does not impose standards of conduct related to the general welfare of youth athletes, but instead focuses on a singular, critical risk to those athletes.

The existence of a legal duty is not, however, the end of the analysis. Contrary to plaintiff's position, Michigan law does not "subscribe to the doctrine of negligence per se." *Candelaria v BC Gen Contractors, Inc*, 236 Mich App 67, 82; 600 NW2d 348 (1999). When a plaintiff proves that an actor has violated the terms of a statute, that is not conclusive proof of negligence. Rather, Michigan law provides that when a statute imposes a legal duty, violation of that statute creates "a rebuttable presumption of negligence," *id.* at 82 n 5, or stated another way, the violation "is only prima facie evidence of negligence," *Wood*, 323 Mich App at 422 n 3. It remains a question of fact, for example, whether the violation had a causal connection to the claimed injury. *Klanseck v Anderson Sales & Service, Inc*, 426 Mich 78, 86-87; 393 NW2d 356 (1986); *Vaas v Schrotenboer*, 329 Mich 642, 650; 46 NW2d 416 (1951); 57A Am Jur 2d, Negligence, § 738, p 711 ("A jury is free to find that a violation of a statutory duty is not necessarily the direct cause of the injury."). Similarly, evidence of a legally sufficient excuse (e.g., natural hazard or sudden emergency) can be used to rebut evidence of a statutory violation. See *Massey v Scripter*, 401 Mich 385, 395; 258 NW2d 44 (1977).

## 2. ORDINARY NEGLIGENCE VERSUS MEDICAL MALPRACTICE

Further complicating the analysis in this case is the distinction between ordinary negligence and malpractice. "A medical malpractice claim is sometimes difficult to distinguish from an ordinary negligence claim. But the distinction is often critical." *Trowell v Providence Hosp & Med Ctrs, Inc*, 502 Mich 509, 517-518; 918 NW2d 645 (2018). A court determines the gravamen of a claim by examining the underlying facts of the case rather than the label that the parties attach to the claim. *Dorris v Detroit Osteopathic Hosp Corp*, 460 Mich 26, 45-46; 594 NW2d 455 (1999).

Our Supreme Court has provided guidance on how to determine whether a claim is properly brought as a medical-malpractice action. The first issue is whether the claim "is being brought against someone who, or an entity that, is capable of malpractice." *Bryant*, 471 Mich at 420. This is a necessary condition for bringing a malpractice suit because a "malpractice action cannot accrue against someone who, or something that, is incapable of malpractice." *Adkins v Annapolis Hosp*, 420 Mich 87, 95; 360 NW2d 150 (1984); *LaFave*, slip op at 3. On this issue, the Legislature has provided that medical-malpractice claims can be brought against "a person or entity who is or who holds himself or herself out to be a licensed health care professional, licensed health facility or agency, or an employee or agent of a licensed health facility or agency." MCL 600.5838a(1).

Once a court has determined that a claim has been brought against a person or entity that is capable of malpractice, a court must then determine whether the claim sounds in medical malpractice. To answer this question, two matters must be considered: "(1) whether the claim pertains to an action that occurred within the course of a professional relationship; and (2) whether the claim raises questions of medical judgment beyond the realm of common knowledge and experience." *Bryant*, 471 Mich at 422. With respect to the latter consideration, our Supreme Court

has explained, "If the reasonableness of the health care professionals' action can be evaluated by lay jurors, on the basis of their common knowledge and experience, it is ordinary negligence." *Id.* at 423. But, "if the reasonableness of the action can be evaluated by a jury only after having been presented the standards of care pertaining to the medical issue before the jury explained by experts, a medical malpractice claim is involved." *Id.*

Returning to the concussion-protection statute, our Legislature has imposed two different types of duty in the first two sentences of MCL 333.9156(3). The first sentence imposes an ordinary-negligence duty. It covers a "coach or other adult employed by, volunteering for, or otherwise acting on behalf of an organizing entity during an athletic event sponsored by or operated under the auspices of the organizing entity." MCL 333.9156(3). This list of covered persons includes lay persons who are not capable of malpractice and against whom a medical-malpractice claim cannot be brought. Furthermore, the action required by the first sentence is one to be taken by lay persons—*any* adult acting on behalf of an organizing entity of an athletic event. The statutory duty does not pertain to a professional relationship with a healthcare professional, as it can apply to a range of lay persons acting in such capacities as a coach, referee, or volunteer. Nor does the duty imposed by the first sentence require medical judgment beyond the realm of common knowledge and experience, as it requires covered adults to remove a youth athlete who is merely "*suspected* of sustaining a concussion." *Id.* (emphasis added). And, although the covered adults must undergo certain training required by other provisions of the concussion-protection statute, see, e.g., MCL 333.9155, there is nothing to suggest that this training alone would be sufficient to put a trainee's knowledge and judgment on par with that of a medical professional. This statutory standard is consistent with our case law holding coaches and other nonparticipant adults in recreational activities "to an ordinary-negligence standard in the absence of an applicable immunity statute." *Sherry v East Suburban Football League*, 292 Mich App 23, 29; 807 NW2d 859 (2011).[1]

In contrast, the second sentence of MCL 333.9156(3) imposes a medical-malpractice duty. The sentence covers "an appropriate health professional," a term defined to mean "a health professional who is licensed or otherwise authorized to engage in a health profession under [MCL 333.16101 *et seq.*] and whose scope of practice within that health profession includes the recognition, treatment, and management of concussions." MCL 333.9155(4)(a). This means that a claim based on a violation of the second sentence "is being brought against someone who, or an entity that, is capable of malpractice." *Bryant*, 471 Mich at 420. The second sentence requires that the "appropriate health professional" evaluate a youth athlete who has already "been removed from physical participation in an athletic activity under this subsection" and further bars the youth athlete from returning to physical participation in that activity until the athlete "receives written clearance from that health professional authorizing the youth athlete's return to physical participation in the athletic activity." MCL 333.9156(3). Thus, the second sentence "pertains to

---

[1] The defendants on appeal appear to be private persons and entities, and therefore there has been no claim on appeal that "[t]he gross-negligence standard" should apply to coaches and other nonparticipants "of *publicly* sponsored athletic teams who are entitled to governmental immunity." *Sherry*, 292 Mich App at 29 (emphasis added). Nor has there been a claim that any of the defendants are exempt from the statutory requirements under MCL 333.9156(4).

-13-

an action that occurred within the course of a professional relationship," *Bryant*, 471 Mich at 422, because the duty applies only to an appropriate health professional who medically evaluates a youth for a suspected concussion. Further, "the claim raises questions of medical judgment beyond the realm of common knowledge and experience," *id.*, because it involves whether a health professional properly diagnosed the youth athlete or properly cleared the youth athlete to return to physical participation in the athletic activity. Thus, a claim for breach of the duty created by the second sentence of MCL 333.9156(3), when brought against a health professional who evaluated the youth athlete, sounds in medical malpractice.

### 3. APPLICATION

### a. DOCKET NO. 346135

We now apply these legal considerations to the factual record in these two appeals. In Docket No. 346135, Polazzo and Metro Health argue that plaintiff's claim against Polazzo sounds in medical malpractice, rather than ordinary negligence. They further argue that plaintiff was required to follow the procedural requirements for filing medical-malpractice actions set forth in MCL 600.2912b and MCL 600.2912d. Because plaintiff failed to do so, these defendants argue that the trial court erred in failing to dismiss the claims against them. In response, plaintiff argues that Polazzo never medically evaluated plaintiff after the first collision, and that a claim against him cannot sound in medical-malpractice because Polazzo exercised no professional medical judgment.

The trial court stated that the question before it was "not whether Polazzo was negligent in his medical treatment, but whether he was negligent in failing to provide medical treatment." That is not, however, the proper question. It is undisputed, for example, that Metro Health is a "licensed health facility or agency," Polazzo is its employee or agent, and, therefore, both are subject to medical-malpractice liability. These matters are irrelevant because plaintiff's claims against these defendants are based on the duty arising from the *first* sentence of MCL 333.9156(3), not the *second*. The list of covered adults in the first sentence encompasses Polazzo, regardless of the fact that he was a licensed-health professional, because it is undisputed that he was an adult acting on behalf of an organizing entity while he served as athletic trainer for the two teams involved in the hockey game. The determination whether a "coach or other adult" complied with the mandate of MCL 333.9156(3) that a youth athlete who is suspected of sustaining a concussion be immediately removed from physical participation in an athletic activity does not raise questions involving medical judgment, regardless of whether the "coach or other adult" was a health professional. Using its common knowledge and experience, a jury could determine whether, based on what happened to plaintiff on the ice, Polazzo should have reasonably suspected that plaintiff suffered a concussion.

Although a claim for breach of the duty established in the second sentence of the statute sounds in medical malpractice, plaintiff's claims in this lawsuit do not implicate that duty. The second sentence applies to the medical evaluation of a youth athlete *after* the athlete has been removed from physical participation in the athletic activity, on suspicion that the athlete sustained a concussion. There are no facts in the record to indicate that Polazzo evaluated plaintiff after he was removed from the hockey game. In fact, plaintiff's claims expressly allege that Polazzo should have—but did not—remove plaintiff from the hockey game. Accordingly, plaintiff's claim against

-14-

Polazzo is not based on the duty created in the second sentence of the statute, and the claim does not sound in medical malpractice.

Because we conclude that plaintiff's claim against Polazzo sounds in ordinary negligence, the trial court properly denied the motion for summary disposition brought by Polazzo and Metro Health, even though the trial court did so for the wrong reason.

## b. DOCKET NO. 346476

In Docket No. 346476, plaintiff appeals by leave granted the trial court's order granting the motion for summary disposition filed by the Association defendants under MCR 2.116(C)(10). In granting that motion, the trial court ruled that plaintiff had failed to raise a genuine issue of material fact that he lay on the ice, unresponsive, for four minutes. Furthermore, the trial court ruled that Fedorinchik could not be liable because he reasonably relied on Polazzo's medical evaluation and his resulting decision not to remove plaintiff from the game.

Regarding the question of how long plaintiff was on the ice, as we explained earlier, we will not consider evidence submitted by plaintiff on appeal but not before the trial court when it ruled on the Association defendants' motion. With that said, we also recognize that granting summary disposition prior to the close of discovery, when the case turns on factual issues not yet settled, is only appropriate when there "is no reasonable chance that further discovery will result in factual support for the nonmoving party." *Colista v Thomas*, 241 Mich App 529, 538; 616 NW2d 249 (2000). In this case, the trial court granted the motion for summary disposition filed by the Association defendants before the close of discovery, despite the reasonable chance that further discovery could result in factual support for plaintiff's claim that he was unconscious on the ice for a period of four minutes.

With respect to Fedorinchik, the first sentence of the statute unquestionably applies to him because he was acting in his capacity as a "coach" of "an organizing entity during an athletic event sponsored by or operated under the auspices of the organizing entity." MCL 333.9156(3). Under this sentence of the statute, Fedorinchik had a duty, independent of the actions of Polazzo, to "immediately remove from physical participation in an athletic activity a youth athlete who is suspected of sustaining a concussion during the athletic activity." *Id*. Whether there was a legally sufficient excuse for Fedorinchik to rely on Polazzo's recommendation given the latter's medical training, whether Polazzo actually made a recommendation, or whether Fedorinchik did or should have suspected that plaintiff had sustained a concussion, are all factual questions that cannot be answered conclusively on this limited record on appeal. Similarly, the trial court erroneously granted summary disposition to the Association defendants before the close of discovery.

## III. CONCLUSION

Our Legislature enacted the concussion-protection statute to protect youth athletes from the harmful effects of concussions. In doing so, the Legislature did not create, explicitly or by implication, a private statutory cause of action for violation of the statute. Rather, the statute creates negligence-based duties on the part of coaches and other covered adults, and a violation of the statute can be evidence of actionable negligence.

In Docket No. 346135, we affirm denial of the motion for summary disposition filed by Polazzo and Metro Health, and in Docket No. 346476, we vacate the grant of summary disposition for the Association defendants. We remand the case to the trial court for application of the standards set forth in this opinion and for further proceedings consistent with this opinion. On remand, the trial court may permit such additional discovery as it deems appropriate, and it may entertain additional motions for summary disposition from the parties after the close of discovery.

We do not retain jurisdiction. Plaintiffs, having prevailed in full, may tax costs under MCR 7.219(F).

/s/ Brock A. Swartzle
/s/ Kirsten Frank Kelly
/s/ Karen M. Fort Hood